1  Michael A. Long, Esq. (SBN: 266555)
2  [mlong@aexius.com]
   LONG & ASSOCIATES
3  1920 Hillhurst Avenue, #1139
   Los Angeles, CA 90027
4  T: (310) 625-3395
5  F: (213) 915-3133
   *Counsel for Plaintiff, SITETOOLS, INC.*
6

7  John B. Berryhill (*Admitted Pro Hac Vice*)
8  [john@johnberryhill.com]
   John B. Berryhill LLC
9  204 East Chester Pike
   First Floor, Suite 3
10 Ridley Park, PA 19078
11 +1.610.565.5601 voice/fax
   *Counsel for Plaintiff, SITETOOLS, INC.*
12

13

14                **UNITED STATES DISTRICT COURT**

15                **CENTRAL DISTRICT OF CALIFORNIA**

16
   SITETOOLS, INC., a California          Civil Case No.:  2:22-cv-08263-DMG-PVE
17 corporation,                           [***Assigned to the Honorable Dolly M. Gee***]
                    Plaintiff,
18                                         **DECLARATION OF PHILIP**
19        vs.                              **ANCEVSKI**

20                                         *[Filed Concurrently with Opposition to*
   BANSK GROUP LLC, a Delaware            *Motion to Dismiss; [Proposed] Order on*
21 corporation,                           *Request for Judicial Notice; Request for*
                    Defendant.            *Judicial Notice; Declaration of Michael A.*
22                                         *Long; Declaration of John Berryhill]*
23

24
                                           Date: March 24, 2023
25                                         Time: 9:30 am
26                                         Ctrm: 8C

27                                         Complaint Filed: November 12, 2022

                    **DECLARATION OF PHILIP ANCEVSKI**

1

2 **DECLARATION OF PHILIP ANCEVSKI**

3 I, Philip Ancevski, declare:

4 1.    I am the CEO of Plaintiff, SiteTools, Inc., in the above-captioned matter

5 styled as *SiteTools, Inc. v. Bansk Group LLC*, Ninth Circuit Case No. 2:22-cv-08263-

6 DMG-PVC filed on November 12, 2022. I have personal knowledge of the facts stated

7 herein. If called to testify, I would and could testify competently.

8 2.    I make this declaration in opposition to Defendant's Motion to Dismiss.

9 3.    Plaintiff, SiteTools, Inc. and myself reached a settlement in a lawsuit

10 styled as *Pocketbook v. SiteTools, Inc., et al.,* (Case No. CV 20-8707-DMG (PDx)).

11 Attached hereto as **Exhibit A** is a true and correct copy of the Order re Defendant's

12 Motion for Summary Judgment [52] as filed by the Clerk on February 2, 2022 in

13 *Pocketbook v. SiteTools, Inc., et al.*

14 4.    SiteTools, Inc.'s principal place of business is in Manhattan Beach,

15 California. The domain name <bansk.com> was registered and has been used since

16 2013.

17 5.    I reviewed the Declaration of William Morden, general counsel for

18 Defendant, Bansk Group LLC. This dispute arises from the use of the web domain

19 <bansk.com> owned and registered by SiteTools, Inc. and a later initiated registration

20 for "Bansk" (Disputed Mark) sought to be asserted by Defendant Bansk Group, LLC

21 against the original registrant SiteTools, Inc. based in California.

22 6.    I am informed that Defendant submitted a statement of use dated June 26,

23 2020 for the mark BANSK using a business card of "Bill Mordan, Senior Partner."

24 Attached hereto as **Exhibit B** is a true and correct copy of the Defendant's Statement of

25 Use and specimen as filed in the United States Patent & Trademark Office downloaded

26 from <https://tsdr.uspto.gov/> for U.S. trademark serial number 88406480

27

7.      The BanskGroup.com website has an "Investor Portal" from which investors from this jurisdiction may log in to, which I accessed from California. Attached hereto as **Exhibit C** is a true and correct copy of a screenshot of the "Investor Portal" page from <https://banskgroup.investorflow.com>.

**Statements re: Systematic and Regular Contacts in California By and Through Its Businesses Including Sephora:**

8.      I am informed that Bansk Group acquired interest in retailer Sephora which has systematic and continuous contact in California through its numerous retail stores and electronic commerce activity directed into California. Bansk Group regularly conducts activities throughout the entire United States through its various holdings. For example, "Founded in 2019, Bansk Group is a New York-based private investment firm focused on investing in and building distinctive consumer brands. With over $2 billion in assets under management, the firm partners with differentiated brands across four primary consumer categories: beauty & personal care, consumer health, food & beverage, and household products." Attached hereto as **Exhibit D** is a true and correct copy of a report dated May 12, 2022 entitled, "Bansk Group to Acquire a Majority Stake in Industry-Leading Haircare Brands amika and Eva NYC" available at <https://www.prnewswire.com/news-releases/bansk-group-to-acquire-a-majority-stake-in-industry-leading-haircare-brands-amika-and-eva-nyc-301546278.html>. Sephora, which Bansk Group co-owns through an acquisition via a subsidiary, is also based in San Francisco, California.

9.      I am informed that Bansk Group also made this announcement on or around June 2022 via LinkedIn. Attached hereto as **Exhibit E** is a true and correct copy of Bansk Group LLC's LinkedIn profile, downloaded from LinkedIn.com on February 15, 2023 at <https://www.linkedin.com/company/bansk-group/>.

10.      I am informed that Bansk Group's partner, Chris V. Kelly, is a director of subsidiary companies, amika and Eva NYC. Attached hereto as **Exhibit F** is a true and

correct copy of partner of Bansk, Chris V. Kelly's bio indicating his title as a director of amika and Eva NYC, downloaded from baskgroup.com at <https://www.banskgroup.com/team-Chris_V_Kelly.html>.

11.    I am informed that Bansk Group's interest in retailer Sephora encompasses over 70 stores in Southern California alone. Attached hereto as **Exhibit G** is a true and correct copy of the Sephora store locator showing over 70 stores in Southern California, downloaded from Sephora.com on February 27, 2023 at <https://www.sephora.com/happening/stores/sephora-near-me>.

12.    I am informed that amika has numerous stores in Los Angeles, CA. Attached hereto as **Exhibit H** is a true and correct copy of the Amika store locator in Los Angeles, 90401 downloaded from Amika.com on March 1, 2023 at <https://loveamika.com/pages/salon-locator>.

13.    I am informed that Eva NYC has 24 stores in Los Angeles, CA. Attached hereto as **Exhibit I** is a true and correct copy of the Eva NYC store locator showing 24 stores in Los Angeles, CA, downloaded from Eva-nyc.com on March 1, 2023 at <https://eva-nyc.com/pages/store-locator>.

14.    I am informed that Sephora's catalogue includes 49 amika products. Attached hereto as **Exhibit J** is a true and correct copy of the Sephora store catalogue of 49 Amika products, downloaded from Sephora.com, on March 1, 2023 at <https://www.sephora.com/brand/amika>.

15.    I am informed that the ULTA beauty store's catalogue includes 34 Eva NYC products. Attached hereto as **Exhibit K** is a true and correct copy of the ULTA Beauty store's catalogue of 34 Eva NYC products, downloaded from Ulta.com on February 27, 2023 at <https://www.ulta.com/brand/eva-nyc?page=1>.

16.    Bansk Group has direct contact with the forum, California, because it both sells through its investments in California including Sephora and other brands; and seeks to control and preclude use of the Disputed Mark in California and elsewhere in

the U.S. Mr. Morden's declaration fails to state that BGL will not do business in California. It does business by and through its investments and is therefore subject to California's long-arm statute. Bansk Group does business in California.

**Statements re: Contacts Directed Into California:**

17.    I was contacted by Bansk Group's lawyer, David Ludwig at the beginning of the subject dispute on January 10, 2022, in which he admitted that he researched the domain information via WhoIs, demonstrating that he was aware SiteTools is located in California. Attached hereto as **Exhibit L** is a true and correct copy of the initial email from Mr. Ludwig in which he admits this knowledge. At the time I received the email, and at all times operating the site <bansk.com> which is the domain disputed in this action, I have resided in California and the website is subject to jurisdiction in California by its directing activity at California residents who visit the website <bansk.com> which Defendant seeks to obtain from SiteTools, Inc. under threat.

18.    SiteTools, Inc.'s website at <bansk.com> is hosted in California and in other states, specifically with prominent servers in Los Angeles.

19.    Bansk Group via its attorney Mr. Ludwig repeatedly threatened into California by demanding SiteTools, Inc. sell the domain <bansk.com> or be subject to a lawsuit, thereby seeking *in California* to thereby purposefully avail itself of the benefits and protections of doing business in California. By virtue of its selling into California via its investments and gaining profits therefrom; and by also seeking to enforce in California, Bansk Group LLC sought to do business in California. Attached hereto as **Exhibit M** is a true and correct copy of the email from Mr. Ludwig, sent on November 2, 2022, threatening to file a lawsuit against me unless I sold his client the domain.

///

///

///

///

**DECLARATION OF PHILIP ANCEVSKI**

-4-

**<u>Statements re: Precluding Use in California:</u>**

20.    Bansk Group is subject to jurisdiction in California because it has invoked a claim of use in California, and claims damage by not being able to preclude Sitetools, Inc. which is based in California.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States. Executed on this 3rd day of March, 2023.

By: */s/ Philip Ancevski*
Declarant, Philip Ancevski
CEO of Plaintiff, SiteTools, Inc.

# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

POCKETBOOK INTERNATIONAL SA,

                  Plaintiff,

        v.

SITETOOLS, INC., and PHILIP
ANCEVSKI,

                  Defendants.

Case No. CV 20-8708-DMG (PDx)

**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [52] AND PLAINTIFF'S MOTION TO CONTINUE TRIAL AND PRETRIAL DATES [45]**

Before the Court is Defendants SiteTools, Inc. and Philip Ancevski's Motion for Summary Judgment ("MSJ") [Doc. # 52]. The MSJ is fully briefed. [Doc. # 60 ("Opp."), 64 ("Reply").] The Court held a hearing on the MSJ on January 28, 2022. Also before the

Court is Plaintiff Pocketbook International SA's Motion to Continue Trial and Pretrial Dates. [Doc. # 45.] That motion is also fully briefed. [*See* Doc. ## 53, 56.]

For the following reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' MSJ. The Court also **GRANTS** Pocketbook's Motion to Continue.

# I.

## PROCEDURAL BACKGROUND

Pocketbook[1] filed its Complaint in this Court on September 22, 2020, asserting claims for (1) trademark infringement under the Lanham Act, (2) trademark dilution under the Lanham Act, (3) unfair competition under the Lanham Act, (4) cybersquatting under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), (5) common law trademark infringement, (6) violation of California's Unfair Competition Law ("UCL"), and (7) cancellation of a trademark registered by Defendants. [Doc. # 1.] On October 29, 2020, Pocketbook dismissed its claim for trademark dilution without prejudice. [Doc. # 14.] Defendants moved on October 30, 2020 to dismiss Pocketbook's ACPA claim on the basis that it was barred by collateral estoppel, since the issue of bad faith had been litigated by a dispute resolution panel of the Uniform Domain Name Dispute Resolution Policy ("UDRP"). [Doc. # 15.] The Court denied Defendants' motion to dismiss, finding the UDRP claim did not preclude this Court's consideration of the same issue. [Doc. # 23.]

Defendants filed their Answer on April 28, 2021. [Doc. # 25.] Defendants' Answer asserted 13 affirmative defenses, including laches, and asserted counterclaims for (1) abandonment of trademark, (2) reverse domain name hijacking, and (3) unfair competition under the UCL. On May 19, 2021, Pocketbook filed a motion to strike Defendants' UCL claim pursuant to California's Anti-SLAPP statute, dismiss Defendants' counterclaims under Rule 12(b)(6), strike references to the UDRP proceedings and rulings in the counterclaim, and strike the affirmative defenses under Rule 12(f). [Doc. # 27.] On

---

[1] This Order refers to multiple Pocketbook entities throughout. References to "Pocketbook" refer to Plaintiff Pocketbook International SA.

October 19, 2021, the Court issued an order dismissing, with leave to amend, the reverse domain name hijacking counterclaim and the UCL claim, striking a quotation from the UDRP panel decision from the counterclaim, and striking Defendants' affirmative defenses of failure to state a claim, lack of damages, unjust enrichment, frivolous claims, and right to amend. [Doc. # 37.] The Court otherwise denied Pocketbook's motion. On November 9, 2021, Defendants filed a notice that they would not amend their UCL and reverse domain name hijacking claims. [Doc. # 38.] Pocketbook filed its Answer to Defendants' counterclaims on November 30, 2021. [Doc. # 43.]

While Pocketbook's motion to strike and dismiss was pending, the Court entered a scheduling order providing for a non-expert discovery cut-off of December 14, 2021, and a motion filing cut-off of December 17, 2021. [Doc. # 34-1.] On December 3, 2021, Pocketbook filed its motion to continue the pretrial and trial dates in this matter, seeking to extend the case deadlines in order to conduct additional discovery. Pocketbook noticed the motion for hearing on January 7, 2022.[2] On December 17, 2021, Defendants filed their MSJ.

## II.

## FACTUAL BACKGROUND[3]

### A. Pocketbook and its Trademarks

Pocketbook owns two trademarks that involve the word "pocketbook." SUF 5. The first trademark, No. 3675976, was issued September 1, 2009. SUF 6. The second trademark, No. 4820128, was issued September 29, 2015. SUF 16.

---

[2] Pocketbook noted in its motion that it was unable to notice the motion for hearing sooner because of holiday court closures.

[3] Citations herein refer to Defendants' Response to Plaintiff's Statement of Genuine Disputes ("SUF") [Doc. # 65]. Unless otherwise stated, the material facts in this section are uncontroverted. The Court deems facts to be uncontroverted where a party does not provide evidence to support the alleged dispute.

### 1.     Pocketbook's E-Readers

Pocketbook began advertising and marketing e-readers in the United States on May 5, 2008, and began selling e-readers in September 2008.  Konovalov Decl. ¶¶ 15-16 [Doc. # 60-2].  Pocketbook's CEO, Andrey Konovalov, attended the 2011 Consumer Electronics Show, or CES, to display Pocketbook's products.  On November 12, 2012, a website called Good E-Reader published an article reporting that in the previous six months, Pocketbook had "abandoned the USA market completely." [Doc. # 52-7 at 5.]  Konovalov asserts, to the contrary, that Pocketbook has sold e-readers in the United States every year from 2009-2010 and from 2013-2021.  Information for 2011 and 2012 does not appear in the record.  *See* Konovalov Decl., Exs. 3, 6 [Doc. # 67].

### 2.     Mark No. 3675976

When Pocketbook applied for this mark, the United States Patent and Trademark Office ("USPTO") initially refused Pocketbook's application, stating:

Applicant must disclaim the descriptive wording 'POCKET BOOK' apart from the mark as shown because it merely describes applicant's goods that are presumed to include pocket sized digital books.  See 15 U.S.C. §1056(a); TMEP §§1213, 1213.03(a).  Please see attached web pages discussing applicant's goods as a pocket sized electronic book.

SUF 8.  The USPTO registration for the mark issued September 1, 2009 includes such a disclaimer:

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "POCKETBOOK", APART FROM THE MARK AS SHOWN.

SUF 7; [Doc. # 52-5 at 6].[4]  The trademark was registered by a Maryland corporation called Western Graphics, Inc.  SUF 9.  In October 2010, Western Graphics, Inc. assigned "the entire interest and goodwill" of the trademark to a Kansas Corporation called Pocketbook

---

[4] Page references cited herein refer to the page numbers inserted by the CM/ECF system.

USA, Inc.  SUF 10.  In articles of dissolution dated July 9, 2012, the president of Western Graphics, Inc. attested that the corporation "has never owned any tangible personal property and therefore no tangible personal property reports are due."  SUF 11; *see also* [Doc. # 52-5 at 25].  In 2014, Pocketbook USA, Inc. assigned the trademark to Batmore Capital Ltd.  SUF 13.  In July 2020, Batmore Capital Ltd. assigned the trademark to Plaintiff Pocketbook.  SUF 14.

### 3.    Mark No. 4820128

Batmore Capital Ltd. applied for Mark No. 4820128 on February 28, 2013, and it was issued on September 29, 2015.  SUF 16, 17; [Doc. # 52-6 at 13].  The USPTO does not have a record of the assignment of that mark to Pocketbook, but Pocketbook is currently listed as the owner.  SUF 18.

### B.    Pocketbook.com

The domain name "Pocketbook.com" was first registered in 1997.  SUF 1. Defendants' predecessor operated a website at Pocketbook.com beginning in at least 2003, focusing on educational resources for teachers.  SUF 27.  SiteTools acquired the domain name in or about May 2010.  SUF 2.  There is nothing in the record explaining how the domain name was used between 2004 and Defendants' acquisition of the website.

SiteTools filed a trademark application for "Pocketbook.com" on July 20, 2010. SUF 3.  On February 8, 2011, Pocketbook.com displayed a list of "Sponsored Listings" providing links to various websites, including Amazon.com/kindle, BarnesandNoble.com/NOOK/Accessories, and three websites offering consumers guides to e-readers.  A column of "Related Topics" provided a list including "EBook Reader," "Pocketbook," "Kindle Reader," and "Sony Reader."  [Doc. # 60-11 at 53.]  On September 30, 2011, Pocketbook.com displayed an error message displaying a Google logo and stating "404.  That's an error.  The requested URL was not found on this server."  *Id.* at 54.  As of October 31, 2011, Pocketbook.com displayed a list of links with the headings "Finance," "Credit Cards," Investing," and "Credit Report."  *Id*. at 55.

On December 2, 2011, Pocketbook.com displayed links to "Finance," "Investing," and "Credit Cards," as well as a link to "Inquire about this Domain." *Id.* at 56. The site displayed similar links on December 2, 2011 and November 6, 2012. *Id*. at 57-58. As of January 4, 2014, the site redirected to www.refinancemortgage.com. *Id*. at 61. As of January 31, 2022, the site continues to redirect to www.refinancemortgage.com, to a landing page titled "Pocketbook ®."

## C. Pocketbook's Offer to Purchase Pocketbook.com

On February 26, 2013, Dmitry Shemet, a Pocketbook employee, contacted Defendant Ancevski, CEO of SiteTools, seeking to "contact the owner of pocketbook.com domain to discuss possible deal." SUF 36; [Doc. # 52-6 at 38]. Ancevski replied that Pocketbook.com was not for sale and stated "we are in development process." SUF 37.

On September 26, 2013, Shemet emailed Ancevski again to ask if Ancevski had "changed [his] position regarding pocketbook domain name." [Doc. # 52-6 at 40.] Ancevski offered to sell Pocketbook.com, including the trademark, for $850,000. Ancevski stated his offer did not include "the web application we've been working on." *Id*.

On June 9, 2014, Shemet emailed once more to ask "if domain pocketbook.com can be considered for sale." SUF 39. Ancevski replied, "Please let me know if you are a domain broker and/or what is the reason for your interest?" [Doc. # 52-6 at 37.] Shemet said he was the head of an R&D company that had developed the corporate website for Pocketbook and wanted to arrange a domain name for them. [Doc. # 52-6 at 36.] In reply, Ancevski offered to entertain a six-digit offer for Pocketbook.com. Shemet proposed a five-digit offer, and Ancevski refused. *Id*.

On July 26, 2017, Pocketbook's general counsel, Yaroslav Ivanchenko, emailed Ancevski. Ivanchenko wrote (in relevant part):

> Our company is a manufacturer of e-ink readers marketed under the trademark "PocketBook" and has for many years owned and operated business under the name "POCKETBOOK". Also, we are an exclusive licensee of the trademark

"PocketBook" (international trademark registrations No 1199701, No 1223039, No 1034872, U.S. registrations No 4820128 and No 3675976). We have discovered that SiteTools Inc. had registered and currently maintains the domain name pocketbook.com. We are interested in purchasing this Domain Name from your company. We would be prepared to offer you US$ 5 000 for the Domain Name pending all terms are agreeable.

[Doc. # 52-7 at 3.] Ancevski replied:

We also hold trademark on "Pocketbook" USPTO registration number 4099793[.] This seems like ill-attempt to procure an expensive .com domain and we refuse your offer.

*Id.* at 2. Ivanchenko asked for a price that would be acceptable to Ancevski. Ancevski did not respond, and Ivanchenko followed up on August 17, 2017. Ancevski replied "This domain is not for sale, besides, you've greatly underestimated the value of a compound word .com." *Id.*; *see also* SUF 41.

In addition to Pocketbook.com, Defendants have registered hundreds of domain names, such as publichousingauthority.com, iwanttoliveforever.com, and brickproductions.com. Konovalov Decl., Exs. 15, 16. Ancevski has previously been found, in a UDRP proceeding, to have registered and used in bad faith a domain name in which he had no legitimate interests and which was "identical or confusingly similar to" a trademark owned by someone else. *See Terwin Holdings LLC dba The Winter Group v. Philip Ancevski*, Case No. D2006-1035, at *11, 2006 UDRP LEXIS 768 (WIPO Arb. and Med. Ctr. October 9, 2006).

## III.

## REQUEST FOR JUDICIAL NOTICE

Pocketbook asks the Court to take judicial notice of 46 exhibits ("RJN"). [Doc. # 60-8.] Pocketbook requests judicial notice of (1) the California Secretary of State's entry for SiteTools, Inc., (2) decisions from adjudications by the UDRP and arbitrations, (3) documents retrieved from the USPTO website and actions taken by the USPTO, (4) online

-7-

press coverage of Pocketbook, (5) entries from Pocketbook's website, (6) archives from the Internet Archive's Wayback Machine, and (7) screenshots of sitetools.com.

Defendants object to Pocketbook's RJN insofar as Pocketbook asks the Court to take judicial notice of government records and judicial or administrative proceedings "for [the] veracity of the documents or any statements within the documents." Defendants' Objection to Pocketbook's RJN [Doc. # 66]. Defendants also object to Pocketbook's request for judicial notice to the extent Pocketbook asks the Court to take notice of the contents of certain third-party websites, which Defendants assert are not capable of accurate and ready determination. Insofar as the Court grants Pocketbook's RJN as to these documents, the Court does not do so for the truth of their contents.

Pocketbook's RJN is **GRANTED** as to the documents retrieved from the USPTO website and actions taken by the USPTO,[5] online coverage of Pocketbook,[6] the UDRP decision in *Terwin Holdings*, and archives from the Internet Archive's Wayback Machine.[7] Because the Court does not rely on the other documents for which Pocketbook seeks judicial notice in rendering this decision, Pocketbook's RJN is otherwise **DENIED as moot**.

## IV.

## EVIDENTIARY OBJECTIONS

Pocketbook interposes evidentiary objections to Defendants' evidence in support of each of Defendants' proposed undisputed facts, including facts which Pocketbook agrees are undisputed. Indeed, Pocketbook asserts that Defendants' evidence is "all inadmissible." Pocketbook's Evidentiary Objections at 3 [Doc. # 60-6]. Such blanket objections are abusive, frivolous, and inappropriate make-work. The Court admonishes

---

[5] RJN Exhibits E, F, G, H, U, V, Z, EE, FF, and SS [Doc. ## 60-9, 60-10, 60-11].

[6] RJN Exhibits I, J, K, P, Q, R, and S [Doc. ## 60-9, 60-10].

[7] RJN Exhibits W and Y [Doc. # 60-11].

Pocketbook's counsel that future filings that interpose such flagrantly meritless blanket evidentiary objections will not only be summarily denied but will also result in the imposition of monetary sanctions.

To the extent Pocketbook objects to evidence on which the Court does not rely, Pocketbook's objections are **OVERRULED as moot**. Further, the Court need not address in detail vague, boilerplate evidentiary objections lodged at each of Defendants' 61 SUFs without any explanation and not targeted at any specific evidence. *See Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013) ("All of the parties' objections are boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence. . . . On this basis alone, the Court will not scrutinize each objection and give a full analysis of identical objections raised as to each fact.").

The Court also notes that Pocketbook objects to evidence introduced by Defendants while *in the same filing* offering the same or similar evidence in support of its opposition. For example, Pocketbook objects to an action from the USPTO refusing Pocketbook's trademark application on the basis that the "statements" made by the USPTO are hearsay, *see* Pocketbook's Evidentiary Objections, SUF 8, yet Pocketbook asks this Court to take judicial notice of the same type of action from the USPTO.[8] To the extent Pocketbook raises relevance objections to facts specifically discussed herein, the objections are **OVERRULED**. Otherwise, Pocketbook's boilerplate objections on the basis of relevance, hearsay, and Rule 403 are **OVERRULED** in their entirety.

Pocketbook objects that Ancevski lacks the personal knowledge necessary to attest to the facts in his declaration attached to the MSJ, including the date on which SiteTools acquired the Pocketbook.com domain name. *See* Pocketbook's Evidentiary Objections,

---

[8] The Court does not rely on any statements contained in the USPTO action for their truth, and this objection is therefore **OVERRULED**. Even if it did rely on USPTO records, however, they are admissible as public records. *See* Fed. R. Evid. 803(8)(A)(i).

SUF 2; *see also* Pocketbook's Objections to Declarations [Doc. # 60-7]. Ancevski attests that he is the CEO of SiteTools and has been since its incorporation. Ancevski Decl. ¶ 1 [Doc. # 52-1]. The Court has reviewed Ancevski's declaration and has identified no statement about which Ancevski, as the CEO of SiteTools, is unqualified to testify. Pocketbook's objection to Ancevski's declaration on this basis is **OVERRULED**.

Pocketbook likewise objects to the declaration of Defendants' counsel, Michael Rodenbaugh, authenticating the exhibits attached to Defendants' MSJ. *See* Pocketbook's Objections to Declarations [Doc. # 60-7]. Pocketbook objects on the basis that Rodenbaugh's statements authenticating the exhibits attached thereto are hearsay, irrelevant, and lack foundation. Pocketbook's objections are meritless and are **OVERRULED**.

Defendants do not raise any objections under the Federal Rules of Evidence. Defendants do object, however, pursuant to Federal Rule of Civil Procedure 37(c) to Pocketbook's introduction in support of its Opposition of a document assigning Batmore Capital Ltd.'s intellectual property rights to Pocketbook. Defendants object to Pocketbook's introduction of this exhibit on the basis that Pocketbook failed to produce this document during discovery, despite Defendants' request that Pocketbook do so. The Court does not rely on this evidence, and Defendants' request to exclude this evidence is therefore **DENIED** as moot.

## V.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

# VI.

## DISCUSSION

Defendants move for summary judgment on all claims and counterclaims and on Defendants' affirmative defense of laches. Pocketbook argues in opposition that there are disputed issues of material fact, Defendants' MSJ should be denied for failure to comply with the Local Rules, and Defendants' MSJ should be denied pursuant to Federal Rule of Civil Procedure 56(e).

## A. Pocketbook's Request for Denial for Failure to Comply with Local Rules

Pocketbook asks the Court to deny Defendants' MSJ on the basis that Defendants failed to comply with Local Rule 7-3 (requirement to meet and confer before filing), 11-3.1.1 (minimum 14-point font), and 11-6 (25-page limit for memoranda of points and authorities). Defendants appear to have failed to meet and confer in their rush to file their MSJ in advance of the deadline. Defendants should have complied with the Local Rules and with the Court's Standing Order, which requires compliance with Rule 7-3.

Nevertheless, Defendants state they contacted Pocketbook's counsel five days before the motion was filed seeking to meet and confer, and that Pocketbook did not respond. In addition, while Defendants used a 12-point font in their MSJ, they appear to have used line spacing that provided for *fewer* than 28 lines on each page. This observation, and the fact that Defendants used a 14-point font in their Reply (after Pocketbook pointed out the error), leads the Court to conclude that Defendants did not use a smaller font in an effort to evade the page limitation. Although the Court will excuse Defendants' failure to comply here in order that it can proceed to address issues on the merits that the parties already have fully briefed, the Court admonishes Defendants that future filings that fail to comply will be rejected.

**B.      Trademark Infringement**

Any party that "uses" the trademark of another in connection with the sale, offering for sale, or distribution of goods is liable for trademark infringement. 15 U.S.C. § 1114(1). To establish patent infringement, a plaintiff must prove (1) that it has a valid, protectable trademark; and (2) that the defendants' use of the trademark is likely to cause customer confusion. *Applied Info. Sciences Corp. v. eBAY, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007).

**1.      Validity of Pocketbook's Trademarks**

Defendants argue that Pocketbook's trademarks are invalid because the prior assignments Mark No. 3675976 were assignments in gross, and Pocketbook has therefore abandoned the marks. Because the validity of Pocketbook's marks is a threshold issue for Pocketbook's infringement claims, the Court will address this issue first.

**a.      Assignments in Gross**

"[T]he law is well settled that there are no rights in a trademark alone and that no rights can be transferred apart from the business with which the mark has been associated." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1289 (9th Cir. 1992) (quoting *Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969)). Instead, a mark must be assigned "with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and

symbolized by the mark." *Id.* (quoting 15 U.S.C. § 1060). The purpose of this rule is to avoid deceiving or confusing consumers by transferring a mark without maintaining continuity of the goods or services associated with the mark. *Id.*

Defendants argue that the assignment from Western Graphics to Pocketbook USA was an assignment in gross because, although the agreement assigning the mark contained a recital that the mark was assigned along with the goodwill associated with the mark, Western Graphics later asserted that it "never owned any tangible personal property." *See* MSJ at 10. The case law does not demonstrate, however, that tangible personal property must be transferred to effect a transfer of goodwill. For example, "information sufficient to enable [the assignee] to continue" the business the assignor was conducting prior to the assignment may constitute a transfer of goodwill. *See Gallo*, at 967 F.2d at 1289.

Pocketbook has introduced evidence in the form of a declaration from Konovalov that Pocketbook USA became "the successor in all the rights of Western Graphics," and that "at the time of Western Graphics' dissolution, all of its assets had been transferred to its successor in interest Pocketbook USA." Konovalov Decl. ¶¶ 4, 6. Konovalov further explains that Batmore Capital "became the successor in all rights of Pocketbook USA," and that in 2019 Plaintiff became "the successor in all rights of Batmore Capital." *Id.* at ¶¶ 9-10. Konovalov also describes Pocketbook's operations in the United States, beginning in 2008 and continuing through the present day.[9] These statements are sufficient to create a dispute of fact to defeat a motion for summary judgment: Konovalov's statements describe the assignment of *all* of Pocketbook's business, not merely the assignment of its trademarks.[10] Moreover, none of Defendants' evidence suggests that the transfer of Mark

---

[9] It is not clear from Konovalov's declaration to which Pocketbook entity he is referring in paragraphs 15 through 21. This is not important, however, for purposes of understanding the company's activities in the United States during the relevant period.

[10] Defendants object that Konovalov's statements are self-serving, but as the Ninth Circuit has observed, "declarations are often self-serving, and this is properly so because the party submitting it would

No. 3675976 had the effect of deceiving or confusing customers. Defendants have not established an absence of triable issues as to whether the assignment of Mark No. 3675976 was an assignment in gross.

### 2. Right to Sue for Past Infringement

Defendants also argue that Plaintiff—the assignee of the rights—cannot sue for pre-assignment infringement because the right to sue for pre-assignment infringement was not expressly assigned. In general, pre-assignment damages are allowed "only when the right to sue is clearly spelled out in a valid assignment." *H & J Foods, Inc. v. Reeder*, 477 F.2d 1053, 1056 (9th Cir. 1973) (citing *George W. Luft Co., Inc. v Zande Cosmetic Co., Inc.*, 142 F.2d 536 (2d Cir. 1944). If the assignor transfers all its assets to the assignee, however, existing causes of action for trademark infringement are also transferred. *Luft*, 142 F.2d at 541-42; *accord Ricks v. BMEzine.com, LLC*, 727 F.Supp.2d 936, 958 (D. Nev. 2010) (noting that a sale of all an assignor's assets to the assignee "necessarily would include the right to sue for past infringements"). The assertions in Konovalov's declaration show at least a dispute of material fact as to whether Plaintiff is now the successor to all the assets of Western Graphics, Pocketbook USA, and Batmore Capital. For this reason, the Court concludes that Defendants have not demonstrated that Pocketbook's claims for pre-assignment infringement fail as a matter of law.

### 3. Priority

Defendants argue it is the senior mark holder, because Pocketbook's first trademark registration is invalid. The Court has already concluded that a disputed issue of material fact remains as to the validity of Pocketbook's first mark. The Court therefore need not address Defendants' argument regarding priority.

---

use the declaration to support his or her position." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).

### 4. Likelihood of Confusion

To determine whether a likelihood of confusion exists between the original trademark and the allegedly infringing product, courts apply eight factors. *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000); *see also AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). "The eight factors are: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012). These factors "are intended as an adaptable proxy for consumer confusion, not a rote checklist." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011). "[S]ome factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important," but the relative importance of each individual factor will be case-specific. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999); *see also Network Automation*, 638 F.3d at 1149 (stating that "each factor [is assigned] appropriate weight in accordance with its relevance to the factual circumstances presented").

Likelihood of confusion is generally a question of fact, but where "a court can conclude that the consumer confusion alleged by the trademark holder is highly unlikely by simply reviewing the product listing/advertisement at issue, summary judgment is appropriate." *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 939 (9th Cir. 2015).

The third and fifth factors weigh in favor of finding a likelihood of confusion. The marks are similar, in that they both contain the word "Pocketbook." Defendants rely heavily on Pocketbook's disclaimer of "pocket book" in its first trademark application. But in a composite word and design mark, "the dominant portion of a composite word and design mark is the literal portion," *i.e.*, the word that makes up the mark, "even where the

-15-

literal portion has been disclaimed." *In re Viterra Inc.*, 671 F.3d 1358, 1366 (Fed. Cir. 2012). Both Pocketbook and Defendants also rely heavily on the internet for marketing.

The factors that consider the similarity of the products themselves weigh, however, against finding a likelihood of confusion. Most importantly, Pocketbook and Defendants are in entirely different industries: Pocketbook sells e-readers, and Defendants sell online tools for financial services providers. Likewise, the eighth factor weighs heavily against finding a likelihood of confusion: Defendants have disclaimed any intent to expand into e-readers, Ancevski Decl. ¶ 8, and there is no indication in the record that this is likely to change. Pocketbook has provided evidence of confusion in that publications have accidentally linked to Pocketbook.com instead of Pocketbook's website when writing about Pocketbook, but this is not evidence of confusion between the *marks*, only evidence of confusion about Pocketbook's web address. Pocketbook has not presented any other evidence of actual confusion, likely because actual confusion would be implausible.

Pocketbook's mark is not especially strong. To determine the strength of a mark, courts in the Ninth Circuit locate the mark along a continuum ranging from "generic" to "fanciful." *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 605 (9th Cir. 1987). "Descriptive" and "suggestive" marks are relatively "weak" marks. *Id.* (citing *Sleekcraft*, 599 F.2d at 349). A descriptive mark is one that "specifically describes a characteristic or ingredient of an article or service (*i.e.*, 'Park 'N Fly')." A suggestive mark "suggests, rather than describes, an ingredient, quality or characteristic [of the product] (i.e., Sleekcraft)." *Id*.

Pocketbook argues its mark is suggestive, whereas Defendants contend it is merely descriptive.[11] A descriptive mark holder must show "secondary meaning," an association established in consumers' minds between the mark and the product, to receive protection. *Nutri/System*, 809 F.2d at 605. The holder of a suggestive mark, on the other hand, "will

---

[11] Pocketbook calls its mark "at least" suggestive, but makes no argument that it is arbitrary or fanciful as applied to e-readers.

receive protection if the infringing mark is quite similar and the goods or services they connote are closely related." *Id*. (citing *Sleekcraft*, 599 F.2d at 350). Even if Pocketbook's mark is suggestive and not descriptive, there is no question that the goods and services Pocketbook's and Defendants' trademarks connote are not closely related.

Although consumers searching online for Pocketbook are not likely to exercise great care in choosing whether to click on Pocketbook.com, a customer's error in clicking on the wrong link will be readily apparent. Pocketbook suggests that confusion might arise if a consumer visits Pocketbook.com and assumes, wrongly, that Pocketbook no longer exists. Pocketbook cites to *Brookfield* for this idea. 174 F.3d at 1057. But in that case, the Ninth Circuit acknowledged that confusion might arise if a consumer searching for a "MovieBuff" database wrongly believed the database no longer existed and had been replaced with a different entertainment database. *Id*. The court also explained that a consumer who arrived at the wrong website (the junior database) might be content to stay, and thereby profit off the goodwill developed by the senior database. *Id*. In this case, the dissimilarity of the products makes it unlikely that a consumer searching for Pocketbook would visit Pocketbook.com and believe Pocketbook had been replaced by Refinance Mortgage. It is similarly unlikely that a user searching for an e-reader would instead be content with Defendants' mortgage-calculating widgets.

Finally, Pocketbook has presented evidence that Defendants chose their web address in order to cause confusion. Pocketbook.com once contained links to purchase e-readers from Pocketbook's competitors, suggesting that Defendants (or, as Defendants argue, the algorithm that determined which ads were displayed) purchased the domain name with the intent to cause confusion. Yet, Defendants' use of their domain name is not the same as their use of their trademark.

The Court concludes that the majority of the factors weigh against finding a likelihood of confusion. Because Pocketbook's and Defendants' products are so dissimilar, there is nothing that would cause confusion here except Defendants' use of the domain name Pocketbook.com as the web address for Defendants' site, which is more properly

addressed in an ACPA claim. The Court therefore **GRANTS** Defendants' MSJ as to Pocketbook's trademark infringement claim. Because Pocketbook's Lanham Act unfair competition claim, common law trademark infringement claim, and UCL claim also require a likelihood of confusion, the Court **GRANTS** Defendants' MSJ as to those claims as well. Because the Court grants Defendants' MSJ as to Pocketbook's trademark infringement claim, the Court need not consider Defendants' laches affirmative defense.

**B.     ACPA Claim**

Defendants argue that, because Defendants' registration of Pocketbook.com precedes Pocketbook's trademark applications, Pocketbook's ACPA claim fails as a matter of law.

A person shall be liable to the owner of a trademark under the ACPA if the person "has a bad faith intent to profit from that mark" and "registers, traffics in, or uses a domain name that in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark" or is a statutorily protected trademark, like Red Cross or United States Olympic and Paralympic Committee. 15 U.S.C. § 1125(d)(1). The Ninth Circuit has determined that in section 1125(d)(1), "at the time of registration" refers to the time of a first registration. *GoPets Ltd. v. Hise*, 657 F.2d 1024, 1031-32 (9th Cir. 2011). The court reasoned that any other understanding of the statutory language "would make rights to many domain names effectively inalienable." *Id.* at 1032. The court therefore reversed the district court's holding that re-registration of a domain name could constitute a violation of the ACPA.

Here, Pocketbook.com was undisputedly registered in 1997, long before Pocketbook's use of either of its trademarks. Defendants acquired the domain name in 2010. Under *GoPets*, there is no question that Defendants' re-registration did not constitute a violation of the ACPA.

Pocketbook argues that, where evidence of bad faith arises after registration, any subsequent re-registrations (such as Defendants' re-registration in 2019) constitute a

violation of the ACPA. Pocketbook's argument runs counter to the Ninth Circuit's holding in *GoPets* and to the plain language of the statute.

One of the defendants in *GoPets* was an individual, Edward Hise, who had registered the domain name gopets.com in 1999. 657 F.2d at 1027. The plaintiff in *GoPets* was the holder of a service mark, "GoPets," that was undisputedly distinctive in 2004, when the plaintiff began to inquire about purchasing gopets.com from Hise. On November 12, 2006, Hise and his brother began to register domain names similar to gopets.com, such as gopet.mobi and gopets.name. On December 14, 2006, Hise transferred ownership of gopets.com to a corporation he controlled. *Id.* at 1027-29. The plaintiff sued, and the district court granted summary judgment in favor of the plaintiff on his ACPA claims alleging cybersquatting with respect to gopets.com and the other domain names Hise had registered in November 2006. *Id.* at 1029.

On appeal, the Ninth Circuit reversed the district court's grant of summary judgment as to the ACPA claim for gopets.com, as discussed *supra*. The Ninth Circuit affirmed, however, with respect to the other domain names, concluding there was "ample evidence in the record on which to base a finding of bad faith." *Id.* at 1032. Even though the Ninth Circuit found there was "ample evidence" of bad faith on November 12, 2006, the court still concluded that Hise's transfer (and the corporation's re-registration) of the gopets.com domain name on December 14, 2006 did not violate the ACPA.

The only logical understanding of the Ninth Circuit's reasoning is that the time of *initial registration* is the only time an ACPA bad faith claim will arise. The text of the ACPA's cyberpiracy provision accords with the Ninth Circuit's interpretation. The ACPA makes distinctiveness at the time of registration of the domain name a condition for liability. If distinctiveness at the time of re-registration constitutes distinctiveness at the time of registration, as Pocketbook argues is the case in other circuits, then bad faith that arises after the initial registration may give rise to a new ACPA claim. But in this circuit, where distinctiveness at the time of registration means at the time of initial registration,

-19-

distinctiveness at the time of initial registration is a condition for liability, and bad faith that arises after initial registration will not give rise to ACPA liability.

Here, Pocketbook.com was registered in 1997, long before Pocketbook began to use either of its marks. The Court therefore **GRANTS** Defendants' MSJ as to Pocketbook's ACPA claim.

## C. Cancellation of Trademark

Pocketbook contends that Defendants' trademark in Pocketbook.com should be cancelled because it was procured by fraud. A plaintiff can succeed on a claim for cancellation based on fraud if she can establish five elements:

> (1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by that reliance.

*Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013) (citing *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir.1990)). The proponent of a claim for cancellation bears a "heavy burden." *Id*.

Pocketbook argues that Defendants attached a fake business card to their trademark application. Pocketbook makes this argument based on Defendants' representation that a company called Vistaprint printed the business card Defendants included with their trademark application, yet in response to a subpoena, Vistaprint stated it had no records of Defendants ever having placed an order. *See* Opp. at 11. Defendants have attached to their Reply a statement showing a Vistaprint charge on Ancevski's credit card in 2012, rebutting Vistaprint's statement that it had no record of Defendants having placed an order. This is Defendants' MSJ, not Pocketbook's, but the Court concludes that Defendants have

adduced evidence showing a factual dispute as to whether Defendants included a material falsehood in their trademark application.[12]

**D.  Motion to Continue**

Pocketbook filed its motion on December 3, 2021, and seeks to extend the case schedule by three months in order to conduct additional discovery relating to Defendants' counterclaim for abandonment of trademark and Pocketbook's allegations of fraud on the USPTO.  Because the non-expert discovery deadline was December 14, 2021, the Court construes Pocketbook's motion as a motion to reopen discovery.  When ruling on a motion to amend a Rule 16 scheduling order to reopen discovery, courts in this circuit consider six factors:

> 1) whether trial is imminent, 2) whether the request is opposed, 3) whether the non-moving party would be prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and 6) the likelihood that the discovery will lead to relevant evidence.

*City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1066 (9th Cir. 2017) (quoting *United States ex rel. Schumer v. Hughes Aircraft*, 63 F.3d 1512, 1526 (9th Cir. 1995), *vac'd on other grounds*, 520 U.S. 939 (1997)).

On balance, the factors weigh in favor of granting Pocketbook's motion to extend the schedule.  All jury trials in the Central District have been suspended until February 28, 2022 due to the Omicron upsurge.  Even if jury trials resume on March 1, criminal jury

---

[12] Pocketbook also emphasizes that Defendants improperly use the trademark registration symbol next to the word "Pocketbook," rather than Defendants' trademarked "Pocketbook.com," on Defendants' website.  Pocketbook argues this alleged misuse serves as an independent basis for cancellation of Defendants' trademark.  Because Pocketbook has not moved for summary judgment, the Court need not address whether Pocketbook is correct that such misuse would be the basis for cancellation of Defendants' trademark.

trials will have priority over civil trials.  The COVID-19 pandemic has severely impacted civil jury trials in this district, and the trial is this matter is unlikely to take place on April 19, 2022 as currently scheduled.  Trial is therefore not imminent.

Defendants argue Pocketbook was not diligent in taking discovery, and delayed serving discovery requests until September 2021, a year after Pocketbook's complaint was filed.  Pocketbook's counsel asserts, however, that he waited until the Court had ruled on Pocketbook's motion to strike before taking discovery on those counterclaims, and that he attempted to stipulate to continue the discovery deadlines shortly after the Court issued its order on the motion to strike, when it became clear Pocketbook would need additional time. Pocketbook also asserts that, after meeting and conferring, Pocketbook expected Defendants to supplement their discovery responses, and did not learn until late November 2022 that Defendants did not intend to supplement their responses, at which time it was too late for Pocketbook to timely move to compel responses.

The Court's order on Plaintiff's motion to strike also goes to the fifth factor, the foreseeability of the need for additional discovery.  The claims on which the parties were to conduct discovery were not clear until November 9, 2021, when Defendants declined to amend their counterclaims.  Pocketbook could not have foreseen this at the time the Court entered its Scheduling Order in July 2021.

Pocketbook does not describe the additional discovery it seeks to take, so it is difficult to say whether an extension of time is likely to lead to relevant evidence.  This factor is therefore neutral.

The two factors weighing against reopening discovery are the second and third. Defendants oppose the extension Pocketbook seeks, primarily based on Pocketbook's purported lack of diligence.  Defendants also assert they will be prejudiced by the cost of continued discovery.  Defendants do not identify, however, any reason why continued discovery would be especially burdensome here (especially in light of the Court's narrowing of the issues with this Order).  The Court also notes that in the last six weeks, both Pocketbook and Defendants have each filed their own opposed *ex parte* application

-22-

seeking to continue a deadline by just one week, and that both sides' briefs on this motion devote significant time to accusations regarding the other side's purported delays and obstructions to the discovery process. The exercise of a modicum of courtesy, common sense, and professionalism would help conserve the parties' resources as well as judicial resources in the resolution of this action.

In light of the foregoing, Plaintiff's motion to extend the case schedule is **GRANTED**.

**E.      Pocketbook's Request to Deny Defendants' MSJ Pursuant to Rule 56(e)**

Pocketbook, in its Opposition, asks the Court to deny Defendants' MSJ on the basis that Pocketbook has been unable to obtain the evidence it needs to oppose Defendants' MSJ. There is no evidence Pocketbook could obtain, however, that would alter the Court's rulings herein regarding likelihood of confusion and Pocketbook's ACPA claim. The Court therefore **DENIES** Pocketbook's request.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

## VII.

## CONCLUSION

In light of the foregoing,

1. Defendants' MSJ is **GRANTED** as to Pocketbook's claims for trademark infringement, unfair competition, common law trademark infringement, California's UCL, and under the ACPA; and

2. Defendants' MSJ is **DENIED** as to Pocketbook's claim for cancellation of Defendants' trademark and as to Defendants' counterclaim for abandonment of trademark.

3. Pocketbook's Motion to Continue the Trial and Pre-trial Dates is **GRANTED**. The discovery cut-off is extended to March 15, 2022, and the trial is continued to July 19, 2022. A separate order will issue with the amended dates and deadlines.

**IT IS SO ORDERED.**

DATED: February 2, 2022

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

# EXHIBIT BB

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTO Form 1553 (Rev 09/2005)
OMB No. 0651-0054 (Exp 12/31/2020)

# Trademark/Service Mark Statement of Use
## (15 U.S.C. Section 1051(d))

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 88406480 |
| **LAW OFFICE ASSIGNED** | LAW OFFICE 105 |
| **EXTENSION OF USE** | NO |
| **MARK SECTION** | |
| **MARK** | mark |
| **LITERAL ELEMENT** | BANSK |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font style, size or color. |
| **OWNER SECTION (current)** | |
| **NAME** | Bansk Group LLC |
| **MAILING ADDRESS** | 65 Radcliffe Rd. |
| **CITY** | Wellesley |
| **STATE** | Massachusetts |
| **ZIP/POSTAL CODE** | 02482 |
| **STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY** | United States |
| **OWNER SECTION (proposed)** | |
| **NAME** | Bansk Group LLC |
| **MAILING ADDRESS** | 65 Radcliffe Rd. |
| **CITY** | Wellesley |
| **STATE** | Massachusetts |
| **ZIP/POSTAL CODE** | 02482 |
| **STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY** | United States |
| **EMAIL** | XXXX |
| **CORRESPONDENCE INFORMATION (current)** | |
| **NAME** | Linda Graham |
| **PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE** | trademarks@dbllawyers.com |
| **SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES)** | lgraham@dbllawyers.com |

## CORRESPONDENCE INFORMATION (proposed)

| | |
|---|---|
| **NAME** | Linda Graham |
| **PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE** | trademarks@dbllawyers.com |
| **SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES)** | lgraham@dbllawyers.com |
| **DOCKET/REFERENCE NUMBER** | 52119 |

## GOODS AND/OR SERVICES SECTION

| | |
|---|---|
| **INTERNATIONAL CLASS** | 036 |
| **CURRENT IDENTIFICATION** | Providing venture capital, development capital, private equity and investment funding |
| **GOODS OR SERVICES** | KEEP ALL LISTED |
| **FIRST USE ANYWHERE DATE** | 12/16/2019 |
| **FIRST USE IN COMMERCE DATE** | 12/16/2019 |
| **SPECIMEN FILE NAME(S)** | \\TICRS\EXPORT18\IMAGEOUT 18\884\064\88406480\xml5 \SOU0002.JPG |
| **SPECIMEN DESCRIPTION** | Business card associating the services with the mark. |
| **REQUEST TO DIVIDE** | NO |

## PAYMENT SECTION

| | |
|---|---|
| **NUMBER OF CLASSES IN USE** | 1 |
| **SUBTOTAL AMOUNT [ALLEGATION OF USE FEE]** | 100 |
| **TOTAL AMOUNT** | 100 |

## SIGNATURE SECTION

| | |
|---|---|
| **DECLARATION SIGNATURE** | /Linda Graham/ |
| **SIGNATORY'S NAME** | Linda Graham |
| **SIGNATORY'S POSITION** | Attorney of record, Nevada Bar member |
| **DATE SIGNED** | 06/26/2020 |
| **SIGNATORY'S PHONE NUMBER** | 855-705-6414 |

## FILING INFORMATION

| | |
|---|---|
| **SUBMIT DATE** | Fri Jun 26 16:40:52 ET 2020 |
| **TEAS STAMP** | USPTO/SOU-XXXX:XXXX:XXX:X XXX:XXXX:XXXX:XXXX:XXXX-2 0200626164052266653-88406 480-710a2b5a847decc205e1f b21dd4e41753e7e9fde2f53cc 9f5b4d5edaed4576c8fc-CC-4 0501297-20200626163736661 653 |

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1553 (Rev 09/2005)
OMB No. 0651-0054 (Exp 12/31/2020)

# Trademark/Service Mark Statement of Use
## (15 U.S.C. Section 1051(d))

To the Commissioner for Trademarks:
**MARK:** BANSK(Standard Characters, see https://tmng-al.uspto.gov/resting2/api/img/88406480/large)
**SERIAL NUMBER:** 88406480

**OWNER AND/OR ENTITY INFORMATION**
**The owner proposes to amend the following:**
**Current:** Bansk Group LLC, having an address of
    65 Radcliffe Rd.
    Wellesley, Massachusetts 02482
    United States
**Proposed:** Bansk Group LLC, having an address of
    65 Radcliffe Rd.
    Wellesley, Massachusetts 02482
    United States
    Phone:
    Email: XXXX

The owner is submitting the following allegation of use information:

For International Class 036:
Current identification: Providing venture capital, development capital, private equity and investment funding

The mark is in use in commerce on or in connection with all of the goods/services, or to indicate membership in the collective organization listed in the application or Notice of Allowance or as subsequently modified for this specific class.

The mark was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as 12/16/2019, and first used in commerce at least as early as 12/16/2019, and is now in use in such commerce. The applicant is submitting one specimen for the class showing the mark as used in commerce on or in connection with any item in the class, consisting of a(n) Business card associating the services with the mark..
Specimen File1

The applicant is not filing a Request to Divide with this Allegation of Use form.

**Correspondence Information (current):**
    Linda Graham
    PRIMARY EMAIL FOR CORRESPONDENCE: trademarks@dbllawyers.com
    SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): lgraham@dbllawyers.com

**Correspondence Information (proposed):**
    Linda Graham
    PRIMARY EMAIL FOR CORRESPONDENCE: trademarks@dbllawyers.com
    SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): lgraham@dbllawyers.com

The docket/reference number is 52119.

**Requirement for Email and Electronic Filing:** I understand that a valid email address must be maintained by the applicant owner/holder and the applicant owner's/holder's attorney, if appointed, and that all official trademark correspondence must be submitted via the Trademark Electronic Application System (TEAS).

A fee payment in the amount of $100 will be submitted with the form, representing payment for the allegation of use for 1 class.

**Declaration**

☑ The signatory believes that the applicant is the owner of the mark sought to be registered.
**For a trademark or service mark application,** the mark is in use in commerce on or in connection with all the goods/services in the application or notice of allowance, or as subsequently modified.
**For a collective trademark, collective service mark, collective membership mark application,** the applicant is exercising legitimate control over the use of the mark in commerce by members on or in connection with all the goods/services/collective membership organization in the application or notice of allowance, or as subsequently modified.
**For a certification mark application,** the applicant is exercising legitimate control over the use of the mark in commerce by authorized users on or in connection with the all goods/services in the application or notice of allowance, or as subsequently modified, and the applicant is not engaged in the production or marketing of the goods/services to which the mark is applied, except to advertise or promote recognition of the certification program or of the goods/services that meet the certification standards of the applicant.

☑ The specimen(s) shows the mark as used on or in connection with the goods/services/collective membership organization in commerce.

☑ To the best of the signatory's knowledge and belief, no other persons, except, if applicable, authorized users, members, and/or concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services/collective membership organization of such other persons, to cause confusion or mistake, or to deceive.

☑ To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

☑ The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or submission or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.


Signature: /Linda Graham/     Date Signed: 06/26/2020
Signatory's Name: Linda Graham
Signatory's Position: Attorney of record, Nevada Bar member
Signatory's Phone: 855-705-6414

RAM Sale Number: 88406480
RAM Accounting Date: 06/26/2020

Serial Number: 88406480
Internet Transmission Date: Fri Jun 26 16:40:52 ET 2020
TEAS Stamp: USPTO/SOU-XXXX:XXXX:XXX:XXXX:XXXX:XXXX:X
XXX:XXXX-20200626164052266653-88406480-7
10a2b5a847decc205e1fb21dd4e41753e7e9fde2
f53cc9f5b4d5edaed4576c8fc-CC-40501297-20
200626163736661653



**FEE RECORD SHEET**

**Serial Number:**   88406480

**RAM Sale Number:  88406480**

**Total Fees:**      $100

**RAM Accounting Date:  20200626**

| Transaction | Fee Code | Transaction Date | Fee per Class | Number of Classes | Total Fee |
|---|---|---|---|---|---|
| Statement of Use (SOU) | 7003 | 20200626 | $100 | 1 | $100 |

**Transaction Date:**    20200626

# EXHIBIT



# EXHIBIT

# Bansk Group to Acquire a Majority Stake in Industry-Leading Haircare Brands amika and Eva NYC

---

NEWS PROVIDED BY
**Bansk Group →**
May 12, 2022, 12:00 ET

---

*Positions Fast-Growing Independent Haircare Brands to Expand Reach and Bring Sustainable, Quality, and Effective Haircare to a Broader Community of Diverse and Passionate Consumers and Professionals*

NEW YORK, May 12, 2022 /PRNewswire/ -- Bansk Group ("Bansk"), a consumer-focused private investment firm dedicated to building distinctive consumer brands, today announced that it has entered into a definitive agreement to acquire a majority stake in amika and Eva NYC, two of the fastest-growing scaled independent haircare brands in the U.S. Terms of the transaction were not disclosed.

Founded in 2009, amika is one of the largest independent haircare brands in the U.S. and the only one of scale at the intersection of professional, prestige, and digital channels. Brooklyn-born and salon-raised, amika's unwavering commitment to professional-quality products has guided the development of a clean and highly effective portfolio of haircare products and tools that are formulated following EU standards and without harmful ingredients such as SLS and SLES. amika's high-quality, innovative, and responsible products cater to all hair types, textures, and styles, and its brand and artistic culture are defined by an inclusive ethos that has built a passionate and diverse community of loyal consumers and salon professionals. Later this year, amika will receive the highly regarded Clean at Sephora seal across its entire Sephora assortment, joining as only the third professional haircare brand to qualify.

Founded in 2012, Eva NYC has become one of the fastest growing masstige haircare brands in the U.S. The brand is committed to delivering high-quality products with proven results at accessible price points, and is the only masstige brand with an aluminum packaging portfolio that is 100 percent recyclable, certified cruelty-free, vegan, non-GMO, and free of harmful ingredients. Eva NYC has been recognized by its partners for its unrelenting focus on sustainability and has achieved all five pillars of Ulta's Conscious Beauty accreditation as well as Target Zero accreditations. Further underpinning its commitment to leading environmental initiatives in the haircare industry, Eva NYC is the first hair brand to implement a styling tool recycling program with Terracycle.

Both brands are Climate Neutral Certified and sustainably-minded with cruelty-free products, PCR or aluminum packaging, and a focus on giving back to the community. In 2022, the brands intend to achieve a B Corporation ("B-Corp") certification, underscoring the distinctive and unmatched commitment to sustainability and inclusivity amika and Eva NYC represent and improve upon each day.

Upon the close of the transaction, amika and Eva NYC will continue to operate as individual brands under their respective brand presidents, Chelsea Riggs and Jane Moran. In partnership with Bansk Group, the brands will seek to expand their reach across customers, channels, and geographies, while continuing to be industry leaders in sustainability, efficacy, and innovation.

"We are excited to partner with brands that share our vision for the future of the beauty and haircare industry," said Chris Kelly, Partner at Bansk Group. "Consumer interest in high-quality haircare has accelerated in recent years, following the premiumization trends we have seen in other beauty and personal care categories. Today's haircare consumers are increasingly passionate and educated about the quality of the haircare products they use – and how those products are formulated – driving exciting growth opportunities in prestige and masstige hair. Both amika and Eva NYC have built distinctive brands founded on proven efficacy, sustainability, and inclusivity, and are leaders in driving and celebrating innovation and diversity – well positioning them to capture this growth."

"We are thrilled to join forces with Bansk to build on our momentum and accelerate the reach of our mission of friend to hair, hairstylist, people, and the planet in North America and international markets," said Chelsea Riggs, amika Brand President. "Since inception, amika has

pushed the boundaries of beauty to create the very best products that are also accessible, responsible, and beloved by both professionals and consumers. We are confident that the brand will continue to excel with Bansk's support and guidance."

"Today's announcement is a testament to our steadfast commitment to creating a high-quality product and sustainability-focused brand that our consumers love," said Jane Moran, Eva NYC Brand President. "We look forward to our new partnership with Bansk and leveraging their expertise to take Eva NYC to new heights."

Over multiple decades in the consumer industry, members of the Bansk team have developed a track record of building exceptional beauty and personal care brands. amika and Eva NYC will be the firm's second and third acquisitions in the beauty category, following the firm's 2020 acquisition of Ethique, a mission-driven, B-Corp-certified brand offering a comprehensive range of waterless, plastic-free beauty & personal care products.

Financo | Raymond James served as financial advisor and Sidley Austin LLP acted as legal counsel to amika and Eva NYC. Jefferies served as financial advisor and Davis Polk & Wardwell LLP acted as legal counsel to Bansk Group.

## About Bansk Group

Founded in 2019, Bansk Group is a New York-based private investment firm focused on investing in and building distinctive consumer brands. With over $2 billion in assets under management, the firm partners with differentiated brands across four primary consumer categories: beauty & personal care, consumer health, food & beverage, and household products.

Bansk's tenured group of investors and operators have invested more than $30 billion of equity capital across more than 40 transactions with some of the most innovative and well-known consumer companies in the world. With more than three decades of investment experience in the consumer products industry, a global network of relationships, and a tested value creation playbook, Bansk seeks to partner with exceptional founders and management teams to drive outsized organic and acquisitive growth and to position brands for enduring long-term success in the evolving consumer landscape. www.banskgroup.com

**About amika**

Since its founding in 2009, amika has grown to become one of the largest independent haircare brands in the U.S. and is the only independent brand of scale that sits at the intersection of professional, prestige, and digital channels. amika's clean and highly effective portfolio of haircare products and tools has earned the brand numerous accolades, including its standing as a Top 10 hair brand at Sephora, #2 partner brand at SalonCentric, and one of WWD's Most Powerful Beauty Brands. Through its commitment to professional-quality products and an inclusive ethos, amika has built a passionate and diverse community of consumers and salon professionals.

**About Eva NYC**

Founded in 2012, Eva NYC is one of the fastest growing masstige haircare brands in the U.S., with a deep focus on sustainability, affordability, and proven results. The brand was named one of the Top 10 fastest growing haircare brands by Tribe Dynamics, the #1 fastest growing mass hair brand at Ulta, and the #1 fastest growing hair brand at Sally Beauty for the third consecutive year. As the only masstige haircare brand with an aluminum portfolio that is 100 percent recyclable, certified cruelty-free, vegan, non-GMO, and free of harmful ingredients, Eva NYC combines powerful, clean ingredients with innovative technologies and a leading network of U.S. retail distribution partnerships to reach a growing number of sustainably-minded customers each day.

**Contacts**

Bansk Group
Woomi Yun / Erik Carlson
Joele Frank, Wilkinson Brimmer Katcher
212-355-4449

SOURCE Bansk Group

# EXHIBIT



Join now    **Sign in**



...

<mark>**Bansk Group**</mark>

Venture Capital and Private Equity Principals

New York, New York  ·  1,012 followers

Builders of Distinctive Consumer Brands

<div align="center">Follow</div>

**View all 18 employees**

## About us

Bansk Group is a consumer-focused private investment firm led by a tenured group of investors and operators that have amassed in-depth experience across the global CPG landscape and collectively invested over $30 billion of equity capital.

Our thematic approach seeks to partner with distinguished brands in high-growth areas across household products, beauty & personal care, consumer health, food & beverage, and related services to build leading platforms that will benefit from our team's experience, resources, and network.

Bansk is headquartered in New York City and London and currently manages ~$1.5 billion of assets.

**Website**                                    **http://banskgroup.com/** ↗

| | |
|---|---|
| **Industries** | Venture Capital and Private Equity Principals |
| **Company size** | 11-50 employees |
| **Headquarters** | New York, New York |
| **Type** | Partnership |
| **Founded** | 2020 |

## Locations

Primary

340 Madison Ave
22C
New York, New York 10017, US

Get directions ↗

## Employees at Bansk Group

 **Bill Mordan**
Senior Partner and General Counsel at Bansk Group

 **Ellan Ben-Hayon**

 **Emily Melchior**
Head of Fundraising & Investor Relations at Bansk Group

 **Chris Kelly**
Partner | Consumer Private Equity | Bansk Group

See all employees

---

## Updates

**Bansk Group**
1,012 followers
2mo

···

We are pleased to announce that we have entered into a definitive agreement to acquire Red's All Natural, a rapidly growing brand of clean-label frozen burritos and breakfast sandwiches in the U.S. We look forward to partnering with Red's CEO and Founder Michael Adair in the next phase of the company's growth and bringing Red's delicious, clean products to more consumers across the country. Read more here: https://bit.ly/3PtCVEe



👍😊❤️ 170 · 2 Comments

---

👍 Like        💬 Comment        ↪ Share

---

**Bansk Group**
1,012 followers
5mo

···

Bansk Group's Chris Kelly recently spoke with Beauty Independent's Rachel Brown to discuss areas of opportunity within the beauty industry, macroeconomic conditions, the most important metric he zeroes in on when evaluating a company, why sustainability isn't incompatible with brand growth, and the TikTok trend "marinated makeup." Read the full article here: https://bit.ly/3qgI72A



**Bansk Group's Chris Kelly: The Premiumization Of Haircare "Is In The Third Inning" - Beauty Independent**
https://www.beautyindependent.com

 46 · 1 Comment

    👍 Like        💬 Comment        ↪ Share

---

**Bansk**  **Bansk Group**
1,012 followers
8mo                                                                   • • •

We are thrilled to announce that Reuben Carranza is joining amika and Eva NYC as CEO. Reuben has an exceptional track record building leading beauty and personal care brands domestically and internationally, and we are excited that he will be leading amika and Eva NYC in the next phase of the brands' growth. We look forward to working closely with him and the amika and Eva NYC leadership teams as we bring the brands' sustainable, high-quality, and effective haircare products to more customers around the world. Read more here: https://bit.ly/3x7R3eY



**Reuben Carranza Joins amika and Eva NYC as Chief Executive Officer**
banskgroup.com

579 · 142 Comments

👍 Like          💬 Comment          ↗ Share



**Bansk Group**
1,012 followers
8mo

At Bansk, #sustainability is integral to everything we do, and we are thrilled to announce another important step forward in our #esg journey. We have received Plastic Negative Workplace and Carbon Neutral certifications from industry-leading accreditors rePurpose Global and MOSS.Earth. In connection with these certifications, Bansk is:

·   Committed to offsetting 2x the plastic waste the firm generated in 2021 across our employee base and corporate office in New York; and
·   Committed to fully offsetting our carbon footprint through the purchase of carbon credits, providing essential funding for carbon abatement and conservation activities

We are committed to supporting impactful sustainability initiatives worldwide while continuing to work closely with our partners to innovate and build brands that share these values.

To learn more, please visit: https://bit.ly/3sTW5ZU



**Bansk Group Announces Plastic Negative and Carbon Neutral Certifications**
banskgroup.com

👍🌱 64

👍 Like          💬 Comment          ↗ Share



**Bansk Group**
1,012 followers
9mo

We are pleased to announce that we have entered into a definitive agreement to acquire a majority stake in amika and Eva NYC, two of the fastest-growing scaled independent haircare brands in the U.S. Read more here: https://bit.ly/3Lak2Ck



138 · 4 Comments

👍 Like          💬 Comment          ➡ Share

**Bansk Group**
1,012 followers
11mo

We are thrilled to announce that Bansk has become a signatory to the Institutional Limited Partners Association's #DiversityinActionInitiative, which brings together limited partners, general partners, and investment consultants who share a common focus and commitment to taking action to advance diversity, equity, and inclusion. These values are foundational components of our success at Bansk, and becoming a signatory is another step forward in our ongoing efforts to promote and increase diversity across the industry and throughout our recruiting, operations, and investment practices. #DEI #privatemarkets

https://lnkd.in/dKJUU_JG

# Bansk

**Press | Bansk Group**
banskgroup.com

🔵 26

---

👍 Like          💬 Comment          ↗ Share

---

## Similar pages

 **Brillon Consumer Products Pvt Ltd (Formerly known as SC Johnson).**
Manufacturing
Gurgaon, Haryana

 **amika**
Personal Care Product Manufacturing
Brooklyn, NY

 **Eva NYC**
Personal Care Product Manufacturing
Brooklyn, New York

🟢 **Becht Foundation**
Non-profit Organizations

Show more similar pages ⌄

## Browse jobs

**Account Manager jobs**
152,491 open jobs

**Manager jobs**
2,003,890 open jobs

**National Account Manager jobs**
25,609 open jobs

**Art Director jobs**
53,920 open jobs

**Sales Director jobs**
92,736 open jobs

**Social Media Manager jobs**
41,932 open jobs

### Marketing Manager jobs

145,613 open jobs

### Executive jobs

700,389 open jobs

### Director jobs

1,374,979 open jobs

### Marketing Executive jobs

95,187 open jobs

Show more jobs like this ⌄

## More searches ⌄

**Linked**in · © 2023

Accessibility

Privacy Policy

Cookie Policy

Brand Policy

Community Guidelines

About

User Agreement

Your California Privacy Choices

Copyright Policy

Guest Controls

Language ⌄

EXHIBIT

Bansk

# Chris V. Kelly

‾‾‾‾

Partner

Chris Kelly is a Partner at Bansk. Chris brings more than 15 years of experience investing in the consumer sector and leads Bansk's efforts across the beauty & personal care, consumer health, and consumer services categories. Prior to joining Bansk, he co-led the Consumer & Retail vertical at TPG Growth, a global middle market and growth equity firm.

Chris received a B.S. in Finance from Brigham Young University and an M.B.A. from the Wharton School of the University of Pennsylvania, where he was named a Palmer Scholar. He currently serves as a Director of amika, Arcadia Consumer Healthcare, Ethique, and Eva NYC. Previously, Chris served as a Director of Crunch Fitness, InStride Education, Mendocino Farms, Philz, and Superior Industries (observer).

# EXHIBIT G





Get FREE shipping on all orders when you join Beauty Insider. Exclusions/terms apply.† **LEARN MORE ▸**

Happening at Sephora | Beauty Services FAQ | My Reservations | **Find a Sephora**

# Find a Sephora

City & State or ZIP | Use my location

SEPHORA Search

**1. Sephora Fig At 7th** Store details

735 S. Figueroa St
Los Angeles, CA 90017
US
(323) 518-2999 • Open until 08:00 PM • 6 mi

**2. Sephora at Kohl's Downey** Store details

300 Stonewood St
Downey, CA 90241
US
• Open until 09:00 PM • 8 mi

**3. Sephora Culver City** Store details

6000 Sepulveda Blvd.
Culver City, CA 90230
US
(310) 915-1542 • Open until 09:00 PM • 9 mi

**4. Sephora at Kohl's Westchester** Store details

8739 S Sepulveda Blvd
Westchester, CA 90045
US
(310) 410-0058 • Open until 09:00 PM • 9 mi

**5. Sephora at Kohl's Alhambra** Store details

1201 S. Fremont Ave
Alhambra, CA 91803
US
(626) 289-7250 • Open until 09:00 PM • 10 mi

**6. Sephora The Steps At Culver City** Store details

9300 Culver Boulevard
Culver City, CA 90232
US
(424) 258-7500 • Open until 09:00 PM • 10 mi

**7. Sephora The Grove** Store details

189 The Grove Drive
Los Angeles, CA 90036
US
(323) 937-0347 • Open until 09:00 PM • 10 mi

**8. Sephora Manhattan Village** Store details

3200 Sepulveda Blvd.
Manhattan Beach, CA 90266
US
(310) 546-8889 • Open until 09:00 PM • 10 mi

See complete store list

## Happening at Sephora

Free services, brand launches, classes & more—see what's going on at your store today.

**See What's Happening**

Advertising Advertising Advertising

Home Shop Offers Me Community Stores

1799 Hawthorne Blvd
Redondo Beach, CA 90278
US
(310) 5

**10. Sep**
ails

2 South
Alhamb
US
(626) 2
✓ Curbs

**11. Sephora Hollywood And**
Store details

Website feedback? Let us know ›

**Find a Store**
Sephora Fig At 7th

**Live Beauty Help**
Available

**Get Sephora Text Alerts**
Sign up Now

**Sephora Credit Card Program**
Want 25% off your Sephora purchase¹? DETAILS

About Sephora ＋

My Sephora ＋

Help ＋

**Region & Language**

United States - English ✓

Canada - English

Canada - Français

## We Belong to Something Beautiful

**Sign up for Sephora Emails**

Enter your email address | Sign Up

**Download the Sephora App**

Download on the App Store | GET IT ON Google Play

© 2023 Sephora USA, Inc. All rights reserved.

Privacy Policy    Terms of Use    Accessibility    Sitemap    Your Privacy Choices ✅❌

Home    Offers



1-877-737-4672    TTY: 1-888-866-9845

(818)769-5809 • Open until 08:00 PM • 13 mi

**21. Sephora at Kohl's Cerritos Towne Center**                    Store details
12821 Towne Center Dr
Cerritos, CA 90703
US
(562) 403-0210 • Open until 09:00 PM • 14 mi

**22. Sephora Pasadena**                    Store details

13 W Colorado Blvd
Pasadena, CA 91105
US
(626) 683-3100 • Open until 08:00 PM • 14 mi

**23. Sephora Rolling Hills Plaza**                    Store details

2665 Pacific Coast Highway
Torrance, CA 90505
US
(424) 271-2600 • Open until 08:00 PM • 14 mi
✔ Curbside Pickup Available

**24. Sephora Burbank Empire Center**                    Store details
1403 N. Victory Pl,
Burbank, CA 91504
US
(818) 748-8982 • Open until 08:00 PM • 15 mi
✔ Curbside Pickup Available

**25. Sephora Santa Monica**                    Store details

1244 Third Street
Santa Monica, CA 90401
US
(310) 395-3460 • Open until 09:00 PM • 15 mi

**26. Sephora Studio City**                    Store details

12036 Ventura Blvd
Studio City, CA 91604
US
(818)506-3166 • Open until 08:00 PM • 15 mi

**27. Sephora at Kohl's Whittier**                    Store details

15602 Whittwood Ln
Whittier, CA 90603
US
(562) 943-9287 • Open until 09:00 PM • 15 mi

**28. Sephora Santa Anita**                    Store details

400 S. Baldwin Ave
Arcadia, CA 91007
US
(626) 445-0400 • Open until 08:00 PM • 16 mi
✔ Curbside Pickup Available


Home




Offers







6440 E Pacific Coast Hwy Suite B-125
Long Beach, CA 90803
US
(562) 999-3967 • Open until 09:00 PM • 17 mi
✔ Curbside Pickup Available

**30. Sephora Pacific Palisades**            Store details

15265 Palisade Village Lane
Pacific Palisades, CA 90272
US
(310) 230-1350 • Open until 07:00 PM • 17 mi
✔ Curbside Pickup Available

**31. Sephora at Kohl's Seal Beach**          Store details

12345 Seal Beach Blvd
Seal Beach, CA 90740
US
(562) 594-3831 • Open until 09:00 PM • 17 mi

**32. Sephora Fashion Square**               Store details

14006 Riverside Drive
Sherman Oaks, CA 91423
US
(818) 817-0900 • Open until 08:00 PM • 17 mi

**33. Sephora at Kohl's Buena Park**         Store details

8191 La Palma Ave
Buena Park, CA 90620
US
(714) 521-8202 • Open until 09:00 PM • 18 mi

**34. Sephora at Kohl's Monrovia**           Store details

504 W. Huntington Drive
Monrovia, CA 91016
US
(626) 301-9261 • Open until 09:00 PM • 18 mi

**35. Sephora at Kohl's Sun Valley**         Store details

8501 Laurel Canyon Blvd
Sun Valley, CA 91352
US
(818) 767-8917 • Open until 09:00 PM • 20 mi

**36. Sephora Plaza West Covina**            Store details

1430 Plaza Drive
West Covina, CA 91790
US
(626) 722-4587 • Open until 08:00 PM • 20 mi
✔ Curbside Pickup Available

**37. Sephora Anaheim - Disney**             Store details

1570 S. Disneyland Drive
Anaheim, CA 92802
US
(714) 758-1700 • Open until 11:00 PM • 22 mi

**38. Sephora Brea**                         Store details

1065 Brea Mall
Brea, CA 92821
US
(714) 674-0333 • Open until 08:00 PM • 22 mi


Home


Offers





**39. Sephora at Kohl's Huntington Beach**    Store details

7777 Edinger Ave
Huntington Beach, CA 92647
US
(714) 373-5317  •  23 mi

**40. Sephora at Kohl's City of Industry**    Store details

21818 Valley Blvd
City of Industry, CA 91789
US
(909) 594-6458 • Open until 09:00 PM  •  25 mi

**41. Sephora Calabasas**    Store details

4799 Commons Way
Calabasas, CA 91302
US
(818) 223-9481 • Open until 07:00 PM  •  26 mi
✓ Curbside Pickup Available

**42. Sephora Topanga**    Store details

6600 Topanga Canyon Blvd.
Canoga Park, CA 91303
US
(818) 704-4600 • Open until 08:00 PM  •  26 mi

**43. Sephora at Kohl's Glendora**    Store details

1225 S Lone Hill Ave
Glendora, CA 91740
US
(909) 592-6960 • Open until 09:00 PM  •  26 mi

**44. Sephora Malibu**    Store details

3896 Cross Creek Rd.
Malibu, CA 90265
US
(310) 317-6767 • Open until 06:00 PM  •  26 mi
✓ Curbside Pickup Available

**45. Sephora at Kohl's Northridge**    Store details

8800 Corbin Ave
Northridge, CA 91324
US
(818) 885-9022 • Open until 09:00 PM  •  26 mi

**46. Sephora Northridge Fashion**    Store details

9301 Tampa Ave
Northridge, CA 91324
US
(818) 886-6500 • Open until 08:00 PM  •  26 mi

**47. Sephora Huntington Beach**    Store details

21040 Pacific Coast Highway
Huntington Beach, CA 92648
US
(714) 536-1415 • Open until 07:00 PM  •  27 mi
✓ Curbside Pickup Available

**48. Sephora South Coast Plaza**    Store details

3333 Bristol Street


Offers




Home

(714) 429-9130 • Open until 08:00 PM • 29 mi

**49. Sephora South Coast Plaza West**    Store details

3333 Bear St.
Costa Mesa, CA 92626
US
(714) 435-1001 • Open until 08:00 PM • 29 mi

✓ Curbside Pickup Available

**50. Sephora Chino Hills**    Store details

13850 City Center Drive
Chino Hills, CA 91709
US
(909) 364-9808 • Open until 08:00 PM • 30 mi

✓ Curbside Pickup Available

**51. Sephora at Kohl's Tustin**    Store details

18182 Irvine Blvd
Tustin, CA 92780
US
(714) 544-4910 • Open until 09:00 PM • 30 mi

**52. Sephora at Kohl's Chino Spectrum Center**    Store details

4093 Grand Ave
Chino, CA 91710
US
(909) 591-8525 • Open until 09:00 PM • 31 mi

**53. Sephora Tustin Market Place**    Store details

2999 El Camino Real
Tustin, CA 92782
US
(714) 669-7746 • Open until 09:00 PM • 32 mi

✓ Curbside Pickup Available

**54. Sephora Montclair**    Store details

2061 Montclair Plaza Lane
Montclair, CA 91763
US
(909) 447-4174 • Open until 08:00 PM • 33 mi

✓ Curbside Pickup Available

**55. Sephora at Kohl's Simi Valley**    Store details

2930 Tapo Canyon Rd
Simi Valley, CA 93063
US
(805) 526-8580 • Open until 09:00 PM • 35 mi

**56. Sephora Westlake Village**    Store details

4000 E Thousand Oaks Blvd
Thousand Oaks, CA 91362
US
(805) 496-1750 • Open until 07:00 PM • 36 mi

✓ Curbside Pickup Available

**57. Sephora at Kohl's Valencia**    Store details

24200 Valencia Blvd
Valencia, CA 91355
US
(661) 260-1205 • Open until 09:00 PM • 36 mi


Home


Offers




24201 West Valencia Blvd.
Valencia, CA 91355
US
(661) 253-0003 • Open until 08:00 PM • 36 mi

**59. Sephora Irvine Spectrum**　　　　　Store details

868 Spectrum Center Drive
Irvine, CA 92618
US
(949) 316-3990 • Open until 09:00 PM • 37 mi
✓ Curbside Pickup Available

**60. Sephora Colonies Crossroads**　　　Store details

1289 East 19th Street
Upland, CA 91784
US
909-297-1591 • Open until 08:00 PM • 37 mi

**61. Sephora at Kohl's Mira Loma**　　　Store details

12315 Liminite Ave.
Mira Loma, CA 91752
US
(951) 685-0860 • Open until 09:00 PM • 40 mi

**62. Sephora The Oaks**　　　　　　　Store details

338 W. Hillcrest Drive
Thousand Oaks, CA 91360
US
(805) 370-9833 • Open until 09:00 PM • 40 mi
✓ Curbside Pickup Available

**63. Sephora at Kohl's Ontario**　　　　Store details

1051 N Milliken Ave
Ontario, CA 91764
US
(909) 484-7805 • Open until 09:00 PM • 41 mi

**64. Sephora Ontario Mills**　　　　　Store details

1 Mills Circle
Ontario, CA 91764
US
(909) 315-5800 • Open until 08:00 PM • 41 mi

**65. Sephora Rancho Cucamonga**　　　Store details

12506 N. Main Street
Rancho Cucamonga, CA 91739
US
(909) 646-7299 • Open until 08:00 PM • 43 mi

**66. Sephora Crossings at Corona**　　　Store details

2690 Tuscany St.
Corona, CA 92881
US
• 44 mi

**67. Sephora Aliso Village**　　　　　Store details

24012 Aliso Creek Rd
Laguna Niguel, CA 92677
US
(949) 484-4045 • Open until 07:00 PM • 44 mi
✓ Curbside Pickup Available

     

Home　　Offers

498 The Shops at Mission Viejo
Mission Viejo, CA 92691
US
(949) 364-3449 • Open until 08:00 PM • 44 mi
✓ Curbside Pickup Available

**69. Sephora at Kohl's Palmdale**   Store details

39850 10Th St W
Palmdale, CA 93551
US
(661) 265-7885 • Open until 09:00 PM • 45 mi

**70. Sephora at Kohl's Rancho Santa Margarita**   Store details

22215 El Paseo
Rancho Santa Margarita, CA 92688
US
(949) 635-9314 • Open until 09:00 PM • 45 mi

**71. Sephora at Kohl's Fontana**   Store details

14960 Summit Ave
Fontana, CA 92336
US
(909) 463-9812 • Open until 09:00 PM • 46 mi

**72. Sephora at Kohl's Riverside at Tyler**   Store details

3520 Tyler Street
Riverside, CA 92503
US
(951) 353-2413 • Open until 09:00 PM • 46 mi

**73. Sephora Riverside**   Store details

2061 Galleria at Tyler
Riverside, CA 92503
US
(951) 785-0717 • Open until 08:00 PM • 46 mi


Home


Offers




EXHIBIT H

FREE SHIPPING ON $50+ ORDERS AFTER DISCOUNTS APPLIED

## amika:

shop all    collections    blog    about    pros    hair quiz    where to buy    rewards    sustainability



# find amika in salons and stores near you

please contact the salon or store directly for more information on hours and availability.

Santa Monica, Los Angeles, CA 90401, USA

Search by Salon Name

Filter by Category ▾



Map data ©2023 Google

### SEPHORA: SANTA MONICA

1244 THIRD STREET, SANTA MONICA, CA 90401

sephora.com

(310) 395-3460

0.4 miles

### NUMBER ONE BEAUTY

1426 MONTANA AVENUE, SANTA MONICA, CA, 90403, US

numberonebeautycenter.com

(310) 656-2455

1.38 miles

### SEPHORA: PACIFIC PALISADES

15265 PALISADES VILLAGE LANE SUITE 2-108, PACIFIC PALISADES, CA 90272, US



hi, friend!
chat with me to get your perfect hair routine

sephora.com

FREE SHIPPING ON $50+ ORDERS AFTER DISCOUNTS APPLIED

**amika:**

shop all | collections | blog | about | pros | hair quiz | where to buy | rewards | sustainability

hair m

UNITED STATES ⌄

**talk to us**

contact us

live chat

email

hair quiz

**help**

order status

FAQ

returns

tool registration

warranty

recycle

rewards

accessibility

safety data sheet

**pros**

education

salon loyalty

salon merch

anti-diversion

**about**

our story

sustainability

the strand blog

giving back

HairToStay

**join us**

careers

carry us

store locator

amika:

© 2023 AMIKA, LLC. ALL RIGHTS RESERVED.

PRIVACY POLICY & TERMS OF USE

AND IF YOU STILL DON'T KNOW WHERE TO GO

CHECKOUT OUR SITEMAP



# EXHIBIT I



# Store Locator

90401



**ANTHROPOLOGIE**

1402 3rd St Promenade
Santa Monica, CA 90401-2322

(310) 393-4763

0.2 mi

**CVS**

500 Wilshire Blvd
Santa Monica, CA 90401

0.5 mi

**CVS**

1411 Lincoln Boulevard
Santa Monica, CA 90401

0.5 mi



**NEWSLETTER**

SUBSCRIBE →

**ABOUT US**

OUR STORY

INGREDIENTS

GIFT CARD

STORE LOCATOR

**ACCOUNT**

MY ACCOUNT

TRACK MY ORDER

REGISTER MY TOOL

WARRANTY

RETURNS & EXCHANGES

**SUPPORT**

CONTACT

FAQ

ACCESSIBILITY

PRIVACY POLICIES

GDPR COMPLIANCE

CCPA COMPLIANCE

TERMS & CONDITIONS

SAFETY DATA SHEETS

© 2023 BY EVA NYC                    300 MESEROLE STREET BROOKLYN, NY

SPIN TO WIN

# EXHIBIT J

Get FREE shipping on all orders when you join Beauty Insider. Exclusions/terms apply.† **LEARN MORE** ▸

Back to Top

# amika

Hair (49)   Clean at Sephora (41)   Mini Size (2)   Tools & Brushes (8)   Gifts (5)

⚙   Sort: Relevance ⌄   Formulation ⌄   Rating ⌄   Concerns ⌄   Hair Type ⌄   Ingredient Prefer

**49 Results**







amika
Perk Up Talc-Free Dry Shampoo
★★★★☆ 2.2K
**$15.00 - $34.00**












Home


Shop

Offers

Me

Community

Stores



**amika**
Soulfood Nourish

★★★★☆ 1.6K
**$18.00 - $52.0**



**amika**
Hydro Rush Inter
Hyaluronic Acid

★★★★☆ 333
**$28.00**




**amika**
The Kure Bond Repair Shampoo for Damaged Hair

★★★★☆ 56
**$28.00 - $44.00**






**amika**
Dream Routine Overnight Hydrating Hair Mask

★★★★☆ 553
**$32.00**







**amika**
The Kure Intense Bond Repair Hair Mask

★★★★☆ 153
**$40.00**






**amika**
The Kure Bond Repair Conditioner for Damaged Hair

★★★★☆ 158
**$28.00 - $44.00**







**amika**
The Wizard Detangling Hair Primer

★★★★☆ 64
**$29.00**







**amika**
Hydro Rush Intense Moisture Conditioner with Hyaluronic Acid

★★★★☆ 188
**$26.00**

 Home    Offers   

     

**amika**
Hydro Rush Inter          aluronic Acid
★★★★☆ 191
$26.00

**amika**
Water Sign Hydra          cid
★★★★☆ 38
$32.00

 

**amika**
The Kure Multi-Task Repair Treatment
★★★★★ 52
$30.00

**amika**
Perk Up Plus Extended Clean Dry Shampoo
★★★★☆ 65
$16.00 - $30.00

  

 

**amika**
Flash Instant Shine Hair Gloss Mask
★★★★☆ 104
$28.00

**amika**
The Closer Instant Split-end Hair Repair Cream
★★★★☆ 112
$28.00

  

 

**amika**
Brooklyn Bombshell Blowout Spray
★★★★☆ 27
$28.00

**amika**
Un.Done Volume and Matte Texture Spray
★★★★☆ 748
$10.00 - $29.00

     

Home          Offers




**amika**
Normcore Hydrat

★★★★☆ 62
**$23.00 - $36.0**




**amika**
3D Volume and T

★★★★☆ 9
**$26.00 - $40.0**






**amika**
Bust Your Brass Blonde Purple Shampoo

★★★★½ 17
**$28.00 - $44.00**

**amika**
Normcore Sulfate Free Shampoo

★★★½☆ 134
**$23.00 - $36.00**






**amika**
Bust Your Brass Cool Blonde Purple Intense Repair Hair Mask

★★★★½ 142
**$40.00**

**amika**
Plus Size Volume & Body Mousse

★★★★☆ 85
**$30.00**



**ONLINE ONLY**




**amika**
Bust Your Brass Blonde Purple Conditioner

★★★★☆ 50
**$28.00 - $44.00**

**amika**
Top Gloss Hair Shine Spray

★★★★☆ 25
**$29.00**

**ONLINE ONLY**

     






**amika**
Velveteen Dream ...ner

★★★★☆ 49
**$28.00**

**amika**
Mini Soulfood No

★★★★☆ 230
**$18.00**




`ONLINE ONLY`



**amika**
Mini Un.Done Volume and Matte Texture Spray

★★★★☆ 17
**$10.00**

**amika**
Curl Corps Curl Defining Cream

★★★★☆ 82
**$28.00**

`ONLINE ONLY`




`NEW`
`LIMITED EDITION`
`ONLINE ONLY`



**amika**
Hydro Rush and Dream Routine Hair Hydration Set

★★★☆☆ 13
**$58.00** ($84.00 value)

**amika**
Curl Corps Curl Enhancing Hair Gel

★★★★☆ 73
**$28.00**

`ONLINE ONLY`



`ONLINE ONLY`



**amika**
3D Volume and Thickening Conditioner

★★☆☆☆ 7
**$26.00 - $40.00** ($45.00 value)

**amika**
Power Hour Curl Refreshing Spray

★★★☆☆ 10
**$28.00**

`ONLINE ONLY`

 
Home




Offers







**amika**
Vault Conditioner
 
★★★★☆ 41
$23.00

**amika**
Hair Blow Dryer B

★★★☆☆ 123
$100.00

**amika**
3D Daily Leave-In Hair Thickening Treatment

★★★★☆ 1
$38.00

LIMITED EDITION



**amika**
Good Vibes Only Hydration + Repair Hair Mask Set

★★★★★ 17
$39.00 ($66.00 value)

**amika**
Double Agent 2-in-1 Straightening Blow Dryer Brush
★★★★☆ 115
$120.00

**amika**
Fadeblock Pre-Shampoo Color Seal

★★★★☆ 122
$26.00

ONLINE ONLY




**amika**
Reset Exfoliating Jelly Scalp Scrub
★★★★⯪ 9
$28.00

ONLINE ONLY



**amika**
High Tide Deep Waver Jumbo
★★★★⯪ 44
$120.00


 Home         Offers            


**amika**
Vault Sulfate Free   air

★★★☆☆ 68
$23.00


**amika**
High Tide Deep V

★★★★☆ 176
$120.00

 

 



**amika**

**amika**

---

**SEPHORA**   🔍 Search    🔍  ♡  🛍️

---

**ONLINE ONLY**

 



**amika**
Illuminati Diamond Ceramic Flat Iron

★★★☆☆ 29
$120.00

**amika**
The CEO 360° Lightweight Powerhouse Hair Dryer

★★★★☆ 28
$200.00





**amika**
The Conductor 1 Inch Precision Germanium Flat Iron

★★★☆☆ 38
$150.00

**amika**
Mini Perk Up Talc-Free Dry Shampoo

★★★☆☆ 7
$15.00

---

 Home         Offers            

**My Sephora**                                                                              +

**Help**                                                                                    +

**Region & Language**

🇺🇸  United States - English  ✓

🇨🇦  Canada - English

🇨🇦  Canada - Français

# We Belong to
# Something Beautiful

**Sign up for Sephora Emails**

| Enter your email address |       **Sign Up**

    

**Download the Sephora App**

App Store          Google Play

© 2023 Sephora USA, Inc. All rights reserved.

Privacy Policy    Terms of Use    Accessibility    Sitemap    Your Privacy Choices ✓✕
1-877-737-4672    TTY: 1-888-866-9845

Home        Offers

# EXHIBIT K

Free Standard Shipping on any $35 purchases !



ULTA

**Shop**    **Brands**    **Sale**    **Discover**    Beauty Services    National Lash Day    🔍  Search products and more

Home / Brand / Eva Nyc

## Eva Nyc    View all ↓

34 results

⇄ Show filters (0)                                                              Sort  Best Sellers ⌄



Eva Nyc
Mane Magic 10-in-1 Primer
★★★★½ (11,590)
$13.00



Eva Nyc
Therapy Session Hair Mask
★★★★½ (8,871)
$17.00



Eva Nyc

Freshen Up Invisible Dry Shampoo

★★★★☆ (5,317)

$13.00

Eva Nyc

Mane Magic 10-in-1 Conditioner

★★★★½ (368)

$13.00 - $25.00

2 sizes



2 sizes

Eva Nyc

Mane Magic 10-in-1 Shampoo

★★★★☆ (1,819)

$13.00 - $25.00

Eva Nyc

Mane Magic 10-in-1 Primer for Fine Hair

★★★★½ (221)

$13.00



Online only



2 sizes

Eva Nyc
Mane Magic 10-in-1 Split End Mender
★★★★⯨ (1,453)
$14.00

Eva Nyc
Kweeen Silver Glitter Spray
★★★★☆ (1,809)
$6.00 - $13.00



2 sizes

Eva Nyc
Healthy Heat Pro-Lite Dryer
★★★★☆ (49)
$74.99

Eva Nyc
Tone It Down Blonde Shampoo
★★★★⯨ (1,342)
$13.00 - $25.00



Eva Nyc

Satin Dream Smoothing Leave-In Cream

★★★★☆ (557)

$13.00

Eva Nyc

Bounce Back Curl Reviving Mist

★★★★☆ (242)

$13.00





2 sizes

Eva Nyc

City Grit Matte Texture Spray

★★★★½ (113)

$13.00

Eva Nyc

Tone It Down Blonde Conditioner

★★★★½ (1,313)

$13.00 - $25.00





Online only

Eva Nyc
Gotta Bounce - Curl Defining Cream
★★★★½ (290)
$13.00

Eva Nyc
Healthy Heat Nano Silk Styling Iron
★★★½☆ (22)
$64.99

Online only



Online only

Eva Nyc
Seeing Stars Holographic Gold Spray
★★★★☆ (8)
$10.00

Eva Nyc
Spectrum Far-Infrared Dryer
★★★★☆ (137)
$89.99



Only here



Eva Nyc

Lazy Jane Salt-Free Wave Spray

★★★★☆ (984)

$13.00

Eva Nyc

Mini Healthy Heat Ceramic Styling Iron + Bag

★★★☆☆ (50)

$29.99





Eva Nyc

Lift Off Volumizing + Thickening Mist

★★★⯪☆ (65)

$13.00

Diamond and Platinum Exclusive!

Eva Nyc

Lazy Jane Air Dry Conditioner

★★★★⯪ (356)

$13.00



Eva Nyc
Lazy Jane Air Dry Shampoo
★★★★☆ (329)
$13.00



Eva Nyc
Shapeshifter Flexible Hairspray
★★★☆☆ (20)
$14.00



Eva Nyc
Just Glisten Hair + Body Shine Mist
★★★★☆ (221)
$13.00



Eva Nyc
Brass to Sass Brunette Shampoo
★★★★☆ (75)
$13.00

Online only





Eva Nyc

Spectrum Far-Infrared 1" Styling Iron

★★★★☆ (146)

$79.99

Eva Nyc

Lift Off Volume Shampoo

★★★☆☆ (75)

$13.00

Diamond and Platinum Exclusive!





Eva Nyc

Brass to Sass Brunette Conditioner

★★★★☆ (53)

$13.00

Eva Nyc

Satin Dream Smoothing Conditioner

★★★★☆ (209)

$13.00





Eva Nyc

Satin Dream Smoothing Shampoo

★★★★☆ (229)

$13.00

Eva Nyc

Lift Off Volume Conditioner

★★★★☆ (44)

$13.00

Diamond and Platinum Exclusive!



Eva Nyc

Tone It Down Blonde Leave-In Cream

★★★★⯪ (30)

$13.00

Eva Nyc

Brass to Sass Brunette Leave-in Cream

★★★★⯪ (26)

$13.00

You have viewed 34 of 34

the *possibilities* are beautiful.

**Ultamate Rewards**

Become a Member

**Ultamate Rewards Credit Card**

Apply Now

Manage My Card



**Get Help**

Track an Order

Shipping and Delivery

Returns

Gift Cards

Ways to Shop

Guest Services Center

Contact Us

Feedback

**Our Company**

About Us

Diversity, Equity & Inclusion

Careers

Investors

Corporate Responsibility

Product Submissions

Affiliate Program

Supply Chain Transparency

UB Media

**Social Media**

 





Si
up
ne
an
sp
of

Rec
em
tex
abo
late
sal
arr
and
spe
offe

Sig

**Download The App**

Scan QR code with
your mobile device

© Ulta Beauty, Inc. 2023

Powered by Quazi™          Do Not Sell My Info

Privacy Policy          Terms & Conditions

EXHIBIT L J

## Subject: Bansk.com domain inquiry



**David Ludwig** <dludwig@dbllawyers.com>                                        Mon, Jan 10, 2022, 11:27 AM
to Philip Ancevski ▾

Mr. Ancevski,

I represent a party that is interested in acquiring the bansk.com domain name. Based on the whois records, I believe SiteTools currently owns this domain. Kindly let me know if your company would be willing to sell this domain, and if so, what your asking price is.

Best regards,

**David Ludwig – Partner**

DUNLAP BENNETT & LUDWIG

T: +1 703-777-7319 D: +1 571-252-3310

# EXHIBIT M



---

**From:** David Ludwig <>
**Sent:** Wednesday, November 2, 2022 12:39 PM
**To:** Philip Ancevski <philip@sitetools.com>
**Subject:** RE: Bansk.com domain inquiry

Mr. Ancevski,

I hope this message finds you well. My client is preparing a complaint under the Anticybersquatting Consumer Protection Act and related laws regarding your company's ownership and use of the bansk.com domain. Before proceeding with that suit, my client wanted me to reach out one more time to see if you would like to avoid the costs of litigation and discuss a reasonable sale of the domain. Our prior offer of $10,000 is still on the table, and we would entertain any reasonable counter-offer. Please let me know. Thanks.

Best regards,

**David Ludwig – Partner**

**DUNLAP BENNETT & LUDWIG**
T: +1 703-777-7319 D: +1 571-252-3310

## Certificate of Service

I certify that on the date undersigned, I filed the foregoing document with the Court's CM/ECF system, which will provide notice of the same to the following:

Lisa Tan, Esq.
RUSSAKOW & TAN, LLP
275 E California Bvd.
Pasadena, CA 91106
Tel.: (626) 683-8869
Fax: (626) 683-8870
Email: ltan@RUSSAKOWTAN.com
*Attorneys for Defendant, BANSK GROUP LLC*

Hyung Gyu Sun
DUNLAP BENNETT & LUDWIG
8300 Boone Blvd., St 550
Vienna, VA 22182
Tel.: 703-777-7319
Fax: 703-777-3656
Email: hsun@dbllawyers.com
*Attorneys for Defendant, BANSK GROUP LLC*

Executed on **March 3, 2023**, at Los Angeles, California.

*/s/ Michael A. Long*
Michael A. Long, Esq.